**In the Matter of Ronald W. MEHRHOFF, Vanita C. Mehrhoff, Engaged in Farming, Debtor.**

**Bankruptcy No. 87–1150–C.**

United States Bankruptcy Court,
S.D. Iowa.

July 5, 1988.

---

Anita L. Shodeen, Des Moines, Iowa, for debtors.

David Carter appeared on behalf of Donald F. Neiman, Des Moines, Iowa, Chapter 7 Trustee.

Linda R. Reade, Asst. U.S. Atty., Des Moines, Iowa, for SBA.

## ORDER ON MOTION TO LIFT STAY

LEE M. JACKWIG, Chief Judge.

A telephonic hearing upon debtors' and trustee's resistances to a motion to lift stay filed on behalf of the Small Business Administration (SBA) was held before this court in Des Moines, Iowa. Anita L. Shodeen appeared on behalf of the debtors. David Carter appeared on behalf of the Chapter 7 trustee, Donald F. Neiman. Linda R. Reade, Assistant U.S. Attorney, appeared on behalf of the SBA. Briefs have been filed by all parties. The matter is fully submitted.

### Factual Background

The debtors received a loan from the SBA in the amount of $11,500.00 on March 1, 1978. The loan was secured by an interest in farm machinery and equipment, as evidenced by a security agreement dated March 20, 1978 and perfected by the filing of a financing statement on March 23, 1978 which was subsequently continued on November 4, 1982. On March 11, 1986 and February 24, 1987 the debtors enrolled in the Production Adjustment Program (Deficiency and Diversion) administered by the Commodity Credit Corporation (CCC) through the Agricultural Stabilization and Conservation Service (ASCS) for 1986 and 1987, respectively.

On April 29, 1987 the debtors filed a voluntary petition under Chapter 7 of the Bankruptcy Code. The debtors identified the SBA claim as unsecured in the amount of $3,800.00 on Schedule A–3. On June 15, 1987 the SBA filed a motion to lift stay seeking to offset the monies owed the debtors in October of 1987 (approximately $1,125.00) and in October of 1988 (estimated at $1,500.00) under the wheat and grain price support program and pursuant to 31 U.S.C. section 3716 and 11 U.S.C. section 553. The agency filed a proof of claim on June 16, 1987 which indicated its interest was fully secured in the amount of $4,040.47. The proof stated the claim was not subject to any setoff. The SBA amended its proof on August 4, 1987 to clarify

that it was claiming "[a]ny available setoff of funds which may be due the debtors from the 1986 and 1987 Production Adjustment programs".

The debtors resisted the motion to lift stay on June 24, 1987 as did the trustee on June 26, 1987. The debtors assert that the SBA is not entitled to a setoff because there is no mutuality of obligation and because the applicable federal regulations do not permit a setoff under the circumstances. The trustee makes essentially the same arguments as the debtors but also asserts, in the alternative, that the contract between the debtors and the government is an executory contract that has not been assumed and therefore is deemed rejected resulting in a breach of that contract.

On August 10, 1987 a discharge of joint debtors was entered in this case. However, the trustee has not abandoned from the estate any interest the estate might have in the 1987 and 1988 payments.

## DISCUSSION

### I. Statutory Provisions

A creditor's right of setoff in bankruptcy is codified at 11 U.S.C. section 553(a), which provides in pertinent part:

> Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of *a* creditor to offset *a mutual debt* owing by *such* creditor to the debtor that arose before the commencement of the case under this title against *a claim of such* creditor against the debtor that arose before the commencement of the case.... (Emphasis added.)

■ In order to qualify for a setoff under section 553, the debts must be mutual and they must be pre-petition. *In re Braniff Airways, Inc.*, 42 B.R. 443, 447 (Bankr. N.D.Tex.1984). The Code does not define "mutual debt". Applicable case law suggests that the debts must be in the same right and must be between the same parties standing in the same capacity. *See In re Rinehart*, 76 B.R. 746, 750 (Bankr.D.S. D.1987) and citations therein.

11 U.S.C. section 101(9) defines a "creditor" as an "entity" meeting certain characteristics. 11 U.S.C. section 101(14) states that an " 'entity' includes person, estate, trust, governmental unit, and United States trustee". In turn, 11 U.S.C. section 101(26) provides that " 'governmental unit' means United States; ... department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), ...". Finally, 11 U.S.C. section 106 states:

> (a) *A* governmental unit is deemed to have waived sovereign immunity with respect to any claim against *such* governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which *such* governmental unit's claim arose.
>
> (b) There shall be offset against an allowed claim or interest of *a* governmental unit any claim against *such* governmental unit that is property of the estate.
>
> (c) Except as provided in subsections (a) and (b) of this section and notwithstanding any assertion of sovereign immunity—
>
> > (1) a provision of this title that contains "creditor", "entity", or "governmental unit" applies to governmental units; and
> >
> > (2) a determination by the court of an issue arising under such a provision binds governmental units. (Emphasis added.)

The attendant legislative history distinguishes the compulsory counterclaim and affirmative recovery aspects of subsection (a) from the estate's power to offset under subsection (b):

> Section 106 provides for a limited waiver of sovereign immunity in bankruptcy cases. Though Congress has the power to waive sovereign immunity for the Federal government completely in bankruptcy cases, the policy followed here is designed to achieve approximately the same result that would prevail outside of bankruptcy....
>
> There is, however, a limited change in the result from the result that would prevail in the absence of bankruptcy; ...

First, the filing of *a* proof of claim against the estate by *a* governmental unit is a waiver by *that* governmental unit of sovereign immunity with respect to compulsory counterclaims, as defined in the Federal Rules of Civil Procedure, that is, counterclaims arising out of the same transaction or occurrence. *The* governmental unit cannot receive distribution from the estate without subjecting itself to any liability it has to the estate within the confines of a compulsory counterclaim rule. Any other result would be one-sided. The counterclaim by the estate against *the* governmental unit is without limit.

Second, the estate may offset against *the* allowed claim of *a* governmental unit, up to the amount of *the* governmental unit's claim, any claim that the debtor, and thus the estate, has against *the* governmental unit, without regard to whether the estate's claim arose out of the same transaction or occurrence as the government's claim. Under this provision, the setoff permitted is only to the extent of *the* governmental unit's claim. No affirmative recovery is permitted. Subsection (a) governs affirmative recovery.

Though this subsection creates a partial waiver of immunity when *the* governmental unit files *a* proof of claim, it does not waive immunity if the debtor or trustee, and not *the* governmental unit, files proof of *a* governmental unit's claim under proposed 11 U.S.C. § 501(c).

This section does not confer sovereign immunity on any governmental unit that does not already have immunity. It simply recognizes any immunity that exists and prescribes the proper treatment of claims by and against the sovereign. (Emphasis added.)

House Report No. 95–595, 95th Cong., 1st Sess. 317 (1977); Senate Report No. 95–989, 95th Cong., 2d Sess. 29–30 (1978), U.S. Code Cong. & Admin.News 1978, p. 5787.

■ Although section 106 concerns the debtor or the estate responding to a claim filed by a governmental unit rather than the governmental unit seeking a setoff, it is of importance in obtaining an understanding of the general principles underlying the entire Code. The use of "a", "such", "the" and "that" in the above quoted Code sections and legislative history suggests to this court that Congress did not intend that one governmental unit be allowed to set off its claim against a claim another governmental unit owes the debtor.[1] Whereas section 106(b) would allow the offset of ASCS–CCC payments against a claim of the ASCS–CCC without the required same transaction or occurrence found in subsection (a), it would not permit such an offset against the claim of any other governmental unit. It should be noted that subsection (b) does not appear to cover the situation where the ASCS–CCC payments are in the nature of a debt, a liability on a claim. *Compare* 11 U.S.C. section 101(11) (debt defined) with section 101(4) (claim defined). That is, if the governmental unit's claim were less than that governmental unit's debt, the excess should be property of the estate available for distribution pursuant to 11 U.S.C. section 726.

## II. Federal Regulations

■ The Code recognizes setoff rights which are created under either federal or state law. *See, e.g. In re Williams,* 61 B.R. 567, 571 (Bankr.N.D.Tex.1986). The SBA in this case asserts a right to offset pursuant to 31 U.S.C. section 3716 which permits a governmental agency to collect a claim by administrative offset. Section 3716(b) requires that the head of the agency must prescribe regulations before collecting a claim by administrative offset. 13

---

**1.** The debtor in *In re Thomas,* 84 B.R. 438, 440 (Bankr.N.D.Texas 1988) relied in part on 11 U.S.C. § 101(4) in arguing that the mutuality requirement for setoff was missing when funds are paid to him by one governmental agency but his obligation is to another. The bankruptcy court cited two pre Code U.S. Supreme Court cases as evidence of the recognized right of setoff among governmental agencies and concluded that he did "not think that Congress intended to change this long-established governmental right of setoff when it adopted the definition of entity in § 101(4). Certainly, nothing in the legislative history indicated such an intent."

C.F.R. Part 140 contains the regulations set forth by the SBA for purposes of debt collection. 13 C.F.R. section 140.2(a) defines "administrative offset" as "the withholding of money payable by the United States to or held by the United States on behalf of a person to satisfy a debt owed to the United States by that person". 13 C.F.R. section 140.5 sets forth the procedures that must be followed in attempting administrative offset:

(a) SBA may, after attempting to collect a claim from a person under normal SBA collection procedures, collect the claim by means of administrative offset. However, no claim that has been outstanding for more than ten years may be collected by means of administrative offset.

(b) Prior to collecting any claim through administrative offset, SBA shall provide the debtor with—

(1) Written notification, of at least 30 days, concerning the nature and amount of the claim, the intention of SBA to collect the claim through administrative offset, and an explanation of the rights of the debtor under paragraph (b) of this section;

(2) An opportunity to inspect and copy SBA's records with respect to the claim;

(3) An opportunity to enter into a written agreement with SBA to establish a schedule for the repayment of the debt; and

(4) An opportunity for the review, by SBA's Office of Hearings and Appeals in accordance with the provisions of Part 134 of these regulations, of SBA's determination of the existence of the claim. The administrative judge will issue a written final decision at the earliest practicable date, but not later than 60 days after the timely filing of the petition requesting the review.

(c) The right to review is waived by a debtor, subject to paragraph (d) of this section, if the debtor fails to file a written petition on or before the 15th day following receipt of the notice described in paragraph (b) of this section.

(d) If the debtor files a petition for review within 5 days after the established deadline date, and the administrative judge finds that the debtor has shown good cause for the failure to comply with the deadline date, such reviewing official *may* find that the debtor has not waived the right to a review. (Emphasis in original.)

(e) Where another Federal agency certifies to SBA that such agency is owed a debt and that the debtor has been provided due process rights in accordance with the agency's own regulations, SBA may withhold money due the debtor from SBA to satisfy such debt. Prior to such offset, SBA will notify the debtor in writing of SBA's intention to withhold such money to satisfy a debt owed to the United States. Such notice will identify the nature of the debt owed and the agency to which it is owed, as well as the amount of the debt.

(f) The provisions of this section do not apply in any case in which a statute either explicitly provides for or prohibits the collection through administrative offset of the claim or type of claim involved.

7 C.F.R. Part 13 specifies the conditions under which the ASCS and CCC may withhold or set off disbursements under programs administered by the Department of Agriculture. 7 C.F.R. section 13.2(c) defines "setoff" as "the application of a specified amount from amounts payable to a debtor as liquidation, in whole or in part, of an amount owed by the debtor". 7 C.F.R. section 13.4 provides in part:

Setoff shall be made and appropriate notification thereof forwarded to the debtor in all cases (but in none other) where:

(a) A person has been administratively determined to be indebted to any agency of the Department of Agriculture,.... In case of indebtedness subject to setoff under this paragraph, the head of any creditor agency of the Department of Agriculture, or his designee, may, if such action is not prohibited by law, defer or subordinate in whole or in part, the right of the creditor agency to recover through setoff all or part of any indebtedness to such agency, or may withdraw a request

for setoff, if he determines that such action is in the best interest of the program administered by such creditor agency and that the financial rights of the Government are protected.

. . . .

(d) A person is indebted to the Internal Revenue Service for taxes due the United States and such Service has filed a notice of lien in accordance with the Internal Revenue Code and has submitted a written request for setoff, or has served a Notice of Levy in accordance with section 6331 of the Internal Revenue Code, title 26 of the United States Code, against amounts payable to such person.

(e) A person is indebted to the Department of Labor under an agreement entered into with the United States pursuant to section 1462 of title 7, United States Code, in connection with the employment of Mexican agricultural workers.

(f) A person is otherwise indebted to any agency of the United States and the Administrator, ASCS, or his designee, has specifically authorized setoff.

However, according to 7 C.F.R. section 13.-5(c), setoff is *not* permitted "[w]here collection of a debt has been barred by a discharge in bankruptcy and the debtor has not expressed a desire to make payment".

7 C.F.R. section 13.6 governs the procedures that must be followed by a creditor agency. It states:

(a) Indebtedness to CCC and ASCS shall be set off in accordance with instructions issued by ASCS, *without* a request for setoff having been made to the appropriate ASCS State office. (Emphasis added.)

(b) Setoffs to recover indebtedness to agencies other than those described in paragraph (a) of this section shall be made only upon filing of a request or serving of a Notice of Levy in accordance with this section. No request shall be filed until the creditor agency has made reasonable efforts through other administrative means available to it to collect the indebtedness.

(c) The following requests for setoff and Notices of Levy shall be mailed or delivered to the appropriate ASCS State office:

(1) Requests for setoff made by other agencies within the Department of Agriculture.

(2) Requests for setoff submitted or Notices of Levy serviced by the Internal Revenue Service.

(3) Requests submitted by the Department of Labor for setoff of a debt which arose in connection with the employment of Mexican agricultural workers.

(d) All other requests for setoff made by other agencies of the United States shall be mailed or delivered to the Administrator, ASCS, or his designee.

(e) Any creditor agency may inquire from the ASCS county office as to whether the debtor has evidenced an intention to participate in one or more programs for a particular crop year under which funds might become available for setoff under this part, but any request for setoff must be made in accordance with this section.

(f) All requests for setoff shall be submitted in writing signed by an authorized representative of the creditor agency, and shall comply with the following:

(1) Each request shall state the amount of the indebtedness separately as to principal and interest, and interest (if any) shall be computed to a date shown in the request. If the creditor agency desires that additional interest be computed on the principal, a daily or monthly interest factor per dollar of principal shall be shown in the request. The amount to be set off shall not exceed the principal sum owed by the debtor plus interest computed in accordance with the request.

(2) Each request shall also state the name and address of the debtor and a brief description of the indebtedness, including identification of the court judgment, if any.

(3) If a notice of lien has been filed in accordance with the provisions of the

Internal Revenue Code, section 6323 of title 26, United States Code, the request or Notice of Levy shall also state the date of filing such notice of lien. (4) If the request is submitted by a corporate agency in connection with a debt which has not been reduced to judgment, the request shall include an agreement to save CCC harmless from liability in the event that the setoff is made against an amount payable by CCC.

The priority of setoffs is established by 7 C.F.R. section 13.7:

(a) Debts shall be collected by setoff in the following order of priority:

(1) Debts to CCC and ASCS.

(2) Debts to other agencies of the Department of Agriculture.

(3) Debts to the Internal Revenue Service.

(4) Debts to other agencies.

(b) Within each priority grouping in paragraph (a) of this section, the order of setoff shall be the chronological order of the dates of entry of the debts on the debt record in the ASCS county office.

Finally, 7 C.F.R. section 13.9 clarifies that any such administrative setoff would not bar a debtor from challenging the debt in question through administrative appeal or through legal action.

Clearly, a review of the very detailed regulations set out above mandates finding that the ASCS–CCC as the entity owing a debt to the debtor is never in the same capacity as the governmental agency to whom the debtor owes a debt, except when the ASCS–CCC is in fact one of the debtor's creditors as contemplated by 7 C.F.R. section 13.6(a).[2] Only in the latter situation are the elaborate procedures for setoff requests not necessary and is setoff almost automatic.

That there is no automatic right to set off the amount the ASCS–CCC owes the debtor in this case against the amount the debtor owes the SBA is evident from the regulations themselves. In accordance with 13 C.F.R. section 140.5(a) and 7 C.F.R. 13.6(b), the SBA would be required to attempt to collect the indebtedness through other means before administrative offset would be proper. According to the original proof of claim, the SBA considered its claim fully secured without resort to setoff.[3] Presumably, it was basing the status of its claim upon an existing security interest in farm machinery and equipment. Nothing in the record indicates whether the SBA did liquidate its interest after the trustee abandoned the property, let alone whether there was a deficiency—an unsecured claim—remaining.[4]

---

**2.** During the past year, this court has seen numerous motions for relief from stay filed by the U.S. Attorney's Office on behalf of the SBA or the Farmers Home Administration (FmHA) seeking to offset ASCS–CCC benefits in both liquidation and reorganization cases. 7 C.F.R. section 1951.105, set out in Appendix A, governs FmHA administrative offset. The regulations are as elaborate and restrictive as those set out in the text of this decision. See in particular subsection (a)(4) (offset not feasible if the borrower is under the jurisdiction of the bankruptcy court) and subsection (g) (FmHA will not offset its loan or grant funds at the request of other agencies).

**3.** An otherwise unsecured claim is considered "secured" to the extent of the setoff amount pursuant to 11 U.S.C. section 506(a) which provides:

An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. . . .

"It is settled law that a claim based on a set-off is not a secured claim." *In re Britton*, 83 B.R. 914, 918 (Bankr. E.D. N.C. 1988) *citing Lowden v. Iowa–Des Moines Nat'l Bank and Trust Co.*, 10 F.Supp. 430, (S.D. Iowa 1935), *aff'd*, 84 F.2d 856, (8th Cir.1936) *cert. denied*, 299 U.S. 584, 57 S.Ct. 109, 81 L.Ed. 430 (1936).

**4.** On June 5, 1987 the trustee filed his application to abandon "real estate" due to a first mortgage in favor of Corydon State Bank and a second mortgage in favor of the FmHA. He also abandoned "machinery, crops, and hog confinement" due to the Bank's security interest.

■ Perhaps most important in concluding there is no automatic right to an administrative setoff of the ASCS–CCC benefits is the prohibition found at 7 C.F.R. section 13.5(c). That is, setoff is not permitted where "collection" of a debt has been barred by a discharge in bankruptcy and where the debtor has not expressed a desire to make a payment.[5]

Had the trustee abandoned the estate's interest in the governmental payments in issue in this case, the SBA could have commenced the offset procedures after August 10, 1987, the date the discharge was entered.[6] Assuming this had been the case, the very regulations suggest the SBA would have been barred from recovery because, under these facts, its unsecured claim would have been discharged in bankruptcy.

In this case the automatic stay remains in effect as to the governmental benefits because the trustee did not abandon them from the estate. 11 U.S.C. section 362(c). The very regulations regarding administrative offset do not apply. 31 U.S.C. § 3716(c)(2). However, the discharge has been entered. Thus, debts not satisfied by collateral (secured) or by a distribution from the estate (unsecured) have been discharged.[7]

## III. Common Law Doctrine

Having determined that the regulations upon which the SBA relies not only do not

establish the "mutual capacity" required by 11 U.S.C. section 553 but cannot be utilized in a bankruptcy context by their own terms, the court now addresses whether the government has a common law right of offset that extends to the bankruptcy arena.

In the recent decision of *In re Britton*, 83 B.R. 914, 917–18 (Bankr.E.D.N.C.1988), the bankruptcy court summarized the development of the concept of setoff in a bankruptcy setting:

> The right to set off mutual debts is a common law doctrine based on principles of equity. It was first recognized in American bankruptcy law in the Bankruptcy Act of 1800 and has continued to be recognized in bankruptcy law up to the present. 4 *Collier on Bankruptcy*, ¶ 553.01 (L. King 15th ed.1987). As the bankruptcy law has developed, however, certain restrictions have been imposed on the right to set-off. The Bankruptcy Code provides that the filing of a petition operates as an automatic stay against the set-off of any debt owing to the debtor that arose prepetition against any claim against the debtor that arose prepetition. 11 U.S.C. § 326(a)(7). Also, the Bankruptcy Code now permits the trustee to recover certain prepetition set-offs which were not recoverable under the Bankruptcy Act. 11 U.S.C. § 553; 4 *Collier on Bankruptcy* ¶ 553.01 (L. King 15th ed.1987).

---

**5.** Reaffirmation agreements must be made before a discharge is granted. 11 U.S.C. section 524(c)(1).

**6.** Aside from the explicit or implicit granting of a motion for relief from stay, 11 U.S.C. section 362(c) governs the termination of the automatic stay:

> (1) the stay of an act against property of the estate under subsection (a) of this section continues until such property is no longer property of the estate; and
> (2) the stay of any other act under subsection (a) of this section continues until the earliest of—
> (A) the time the case is closed;
> (B) the time the case is dismissed; or
> (C) if the case is a case under chapter 7 of this title concerning an individual or a case under chapter 9, 11, 12, or 13 of this title, the time a discharge is granted or denied.

**7.** The trustee makes distributions based, in part, on information provided by creditors in their proofs of claims. In this case, the SBA has not claimed that it is entitled to a distribution as a general unsecured creditor. Yet, from a review of the schedules and proofs of claims in this case, it appears that the SBA might have received a distribution had it filed as a general unsecured creditor. It might have received the largest dividend if it realized nothing from the liquidation of the machinery and equipment. Parenthetically, the court observes that the FmHA did not file a proof of claim in this case. If the information on the debtor's schedules is correct, it may have had a general unsecured claim upon liquidation of the estate. (Ordinarily in a liquidation case, claims must be timely filed 90 days after the first meeting of creditors in order to share in any distribution by the trustee. 11 U.S.C. § 726 and Bankr. R. 3002.)

Certain differences between the set-off provisions of the Bankruptcy Act and the Bankruptcy Code should be emphasized. Section 68a of the Bankruptcy Act provides that "In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor, the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid." The language in section 68a provides for a federal right of set-off. In contrast to section 68a, section 553 of the Bankruptcy Code simply recognizes the right of set-off where it exists in nonbankruptcy law. As a result, many of the cases deciding set-off issues under section 68a of the Bankruptcy Act may not be applicable to cases arising under section 553 of the Bankruptcy Code.

The *Britton* court then observed that North Carolina recognizes the right of set-off after certain requirements such as mutuality are satisfied. *Id.* at 918.[8] In rejecting the Federal Land Bank's argument that the Farmers Home Administration (FmHA) should *not* be allowed *to* offset its debt against the amounts owed the debtors by the CCC because the CCC is not a corporate entity separate from the United States, the court relied on *Cherry Cotton Mills v. United States,* 327 U.S. 536, 66 S.Ct. 729, 90 L.Ed. 835 (1946) and *Luther v. United States,* 225 F.2d 495 (10th Cir.1954), cert. denied, 350 U.S. 947, 76 S.Ct. 321, 100 L.Ed. 825 (1956). *Britton* at 919.

The right of one federal agency to offset against its claim funds owed to the debtors by another agency is often based on language in the *Cherry Cotton Mills* case. *See In re Buske,* 75 B.R. 213, 216 (Bankr. N.D.Tex.1987); *In re Pinkert,* 75 B.R. 218, 220 (Bankr.N.D.Tex.1987); *Waldron v. Farmers Home Admin.,* 75 B.R. 25, 27

(N.D.Tex.1987). *Luther v. United States, supra,* at 498 summarizes the U.S. Supreme Court ruling as follows:

> In *Cherry Cotton Mills v. United States,* 327 U.S. 536, 66 S.Ct. 729, 90 L.Ed. 835, the Government owed the petitioner a certain sum as a refund of processing taxes which had been paid. At the same time, the petitioner owed the Reconstruction Finance Corporation a larger sum as the balance due on a promissory note for money borrowed. The General Accounting Office directed the Treasury to issue a check for the refund in processing tax payable to the Reconstruction Finance Corporation to partially liquidate the indebtedness of the petitioner to that governmental agency. The petitioner brought the action against the Government in the Court of Claims to recover the tax refund. The Government filed a counterclaim based upon the balance due on the note to the Reconstruction Finance Corporation. The Supreme Court discussed the question whether the Court of Claims had jurisdiction to entertain the counterclaim, *but it was implicit in the opinion that the right of setoff existed.* (Emphasis added.)

Relying on the "implicit" right of setoff, the Court of Appeals concluded that overpayments of income tax could be setoff against the amount a debtor in bankruptcy owed the Commodity Credit Corporation.[9]

This court finds reliance on *Cherry Cotton Mills* for the proposition that the SBA is entitled to offset the amounts owed by ASCS–CCC improper. Clearly, the Supreme Court was addressing a specific challenge to the jurisdiction of the Court of Claims to hear and to determine a counterclaim brought by the U.S. Government under a specific section of Title 28. The very language of the opinion limits it to facts

---

**8.** The court finds nothing under Iowa law to suggest that the U.S. Government would be entitled to offset the claim of one agency against the debt owed by another agency. Certainly, the state legislature is without power to create rights among governmental units established by Congress.

**9.** The *Luther* case actually involved a priority dispute under section 64(a)(5) of the Bankrupt-

cy Act which is the predecessor of 11 U.S.C. section 507(a) (expense and claim priorities), not under section 68 which is the predecessor of section 553. As was pointed out in *In re Rinehart,* 76 B.R. 746, 751 (Bankr.D.S.D.1987), neither section 64(a) nor section 507 entails the "mutuality" consideration found in the offset sections.

and circumstances similar to those presented in that nonbankruptcy case:

> Nor do we find any justification for giving to 250(2) the narrow interpretation urged. Its purpose was to permit the Government, *when sued in the Court of Claims,* to have determined in a single suit all questions which involved mutual obligations between the Government and a claimant against it. Legislation of this kind has long been favored and encouraged because of a belief that it accomplishes among other things such useful purposes as avoidance of "circuity of action, inconvenience, expense, consumption of the courts' time, and injustice." *Chicago & N.W.R. Co. v. Lindell,* 281 U.S. 14, 17 [50 S.Ct. 200, 201, 74 L.Ed.2d 670 (1930)] and cases cited.

> *We have no doubt but that the set-off and counterclaim jurisdiction of the Court of Claims was intended to permit the Government to have adjudicated in one suit all controversies between it and those granted permission to sue it, whether the Government's interest had been entrusted to its agencies of one kind or another....* Nor is this *congressionally granted power to plead a counterclaim* to be reduced because in other situations, and with relation to other statutes, we have applied the doctrine of governmental immunity or priority rather strictly. The Government here sought neither immunity nor priority. Its right to counterclaim rests on different principles, one of which was graphically *expressed by the sponsors of the Act of which § 250(2) is a part:* it is "as much the duty of the citizen to pay the Government as it is the duty of the Government to pay the citizen." 58 Cong. Globe 1674, April 15, 1862, 37th Cong., 2d Sess. (Footnote omitted and emphasis added.)

*Cherry Cotton Mills, supra,* at 539–40, 66 S.Ct. at 730.

To interpret *Cherry Cotton Mills* as supporting authority for the proposition that the United States may claim setoff rights among its various units despite a governmental borrower filing bankruptcy ignores the framework of the Code in general and, in particular, the nonbankruptcy law creating the offset right. Indeed, 31 U.S.C. section 3716 does not apply in a bankruptcy context by its own terms. 31 U.S.C. § 3716(c)(2).

## IV. Policy Considerations

The bankruptcy court in *In re Rinehart,* 76 B.R. 746 (Bankr.D.S.D.1987) appears to have been the first court to deny setoff among governmental agencies based on a "lack of mutual capacity" analysis. In that case, the SBA had obtained approval from the ASCS–CCC to offset administratively amounts the ASCS–CCC owed the debtor against its claim. The approval was obtained prior to the filing of the Chapter 11 petition; the ASCS–CCC offset the amount after the commencement of the bankruptcy case; and the SBA subsequently sought relief from the stay to offset the funds against its claim. The court not only found that the SBA did not stand in the same capacity as the ASCS–CCC for purposes of setoff and, therefore, was not entitled to relief from the stay but also found that the SBA had violated the automatic stay and was subject to sanctions for continuing its collection process after the petition was filed. By way of dicta, the court observed:

> Serious bankruptcy reorganization policy concerns are also raised by this issue. To allow a governmental agency like the SBA, FmHA, or the like to piggyback under the guise of "government" and off-set ASCS–CCC farm program payments may effectively deny farmers or ranchers a meaningful opportunity attempt to reorganize in a Chapter 11, 12, or 13 setting. As stated, in the instant facts, the SBA is totally undersecured in terms of its collateral and would otherwise be treated as secured up to the amount of setoff and ASCS–CCC payments owing. See 11 U.S.C. § 506(a) and n. 4. Although the Court is unsure as to the total ASCS–CCC payments owing to the debtors, the SBA's claim is $163,-250.24. Clearly, this impact would be devastating to these farmers and every farmer who, prior to filing, participates in the ASCS–CCC program and owes ei-

ther the SBA or FmHA at the time of filing. This is contrary to the United States Supreme Court's policy analysis in *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). Addressing the question of what is property of the estate under 11 U.S.C. § 541(a), Justice Blackmun, writing for the majority, observed in part:

> In proceedings under the reorganization provisions of the Bankruptcy Code, a troubled enterprise may be restructured to enable it to operate successfully in the future.... By permitting reorganization, Congress anticipated that the business would continue to provide jobs, to satisfy creditors' claims, and to produce a return for its owners. Congress presumed the assets of the debtor would be more valuable if used in a rehabilitated business than if "sold for scrap."

*United States v. Whiting Pools, Inc.*, *supra*, at 203, 103 S.Ct. at 2312. Congress and the President voiced serious concern for family farmer survival in the October, 1986, passage of Chapter 12 bankruptcy reorganization. See Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986 which became effective November 26, 1986. *See also In re Erickson Partnership*, 68 B.R. 819 (Bankr.D.S.D.1987), *aff'd*, 74 B.R. 670 (D.S.D.1987); *In re Rennich*, 70 B.R. 69 (Bankr.D.S.D.1987). (Footnote omitted.)

*Id.* at 754–55. *Cf. Matter of Hazelton*, 85 B.R. 400 (Bankr.E.D.Mich.1988) (FmHA was not entitled to set off amount owed Chapter 12 debtor by the CCC against its claim for policy reasons; "lack of mutual capacity" analysis not adopted).

Agreeing with the reasoning set forth in the *Rinehart* decision, this court recently held that the FmHA did not stand in the same capacity as the ASCS–CCC for the purpose of offsetting against its claim amounts the ASCS–CCC owed the Chapter 12 debtor. *Matter of Butz*, 86 B.R. 595 (Bankr.S.D.Iowa 1988). Implicit in the analysis and deliberation were the above quoted policy concerns.

▇▇▇ Due to the absence of the policy concerns that attend a reorganization case, the court took a much more critical look at the "lack of mutual capacity" analysis in this liquidation case. As is evident from the findings and conclusions in the preceding divisions of this decision, the court is satisfied that setoff under section 553 may be proper when a federal agency seeks to offset its own obligation to the debtor against its claim but is improper when it seeks to offset the obligation of another federal unit. What appears on the surface to be a harsh result for the government agencies and perhaps for taxpayers is actually an implementation of the Congressional balance between fresh starts for debtors and consistent treatment for creditors similarly situated. Overall the Code design works to the general benefit of taxpayers and consumers.

At the outset of a discussion of policy concerns in a liquidation case, the court observes that there is no indication in the present record that the SBA would have sought an administrative setoff if its borrower had not filed bankruptcy despite an outstanding delinquency on the loan.[10] Indeed, the SBA indicated it was not seeking a setoff on its original proof of claim.[11] Although the court can understand the SBA's desire to make the best out of a bad situation once a borrower files for bankruptcy, to grant the SBA relief from the stay to exercise alleged setoff rights post-

---

**10.** According to information dated June 4, 1987 and attached to the SBA's proof of claim, the last payment was made on April 9, 1985 and the next installment due date had been December 20, 1986.

**11.** The court does not address whether the SBA timely requested *setoff* in this case but notes that setoff is an *exercisable* right only. *See In re Britton*, 83 B.R. 914 (Bankr.E.D.N.C.1988) (FmHA's failure to assert right to a setoff in its proof of claim constituted waiver of right and right could not be reinstated by amending the proof of claim to specify such right). *See also In re Stephenson*, 84 B.R. 74 (Bankr.N.D.Texas 1988) (FmHA was barred from claiming any right of setoff as to CCC payments by prior confirmation of plan of reorganization—neither plan nor government's objection to plan addressed setoff).

petition would permit it to improve its position at the time of filing at the expense of other similarly situated creditors.[12]

Assuming the prohibition found at 31 U.S.C. section 3716(c)(2) were of no force and effect upon the granting of the motion for relief from stay—meaning that an administrative right of setoff would exist, the SBA presumably would follow the detailed and time consuming steps set out in the regulations. The trustee would keep the estate open while the SBA obtained a final administrative decision on its request for setoff. If the SBA was not successful by virtue of 7 C.F.R. 13.5(c) or for some other reason, the trustee would then be able to distribute any ASCS–CCC payments he was holding minus (figuratively speaking) the time value of the dividends.

At this juncture the court speculates that what the SBA seeks in essence, if not in form, is not relief from the stay but rather a court determination of the allowed amount of its "secured" claim and a court order directing the trustee to abandon the estate property in issue directly to it. 11 U.S.A. § 506(a); 11 U.S.C. § 554.[13] The government would have the court fashion a setoff based on principles of equity found in common law. One recent bankruptcy decision has attempted to do just that. In *In re Thomas,* 84 B.R. 438 (Bankr.N.D.Texas 1988), the U.S. Attorney filed a motion for relief from stay on behalf of the FmHA, the SBA and the CCC to set off claims against ASCS–CCC disaster payments to the debtor. The debtor asked that the IRS be included in the distribution and paid in full first according to 11 U.S.C. section 507(a)(7). The bankruptcy court held that section 507(a)(7) did not apply to setoff. The court also found that the priority set forth in the federal regulations did not apply in a bankruptcy setting. Rather he concluded that setoff of the IRS claim was mandated by 11 U.S.C. section 106(b). Accordingly, the court directed that the governmental units share the setoff amount pro rata after the FmHA and the SBA adjusted their respective claims upon liquidation of certain collateral.

This court acknowledges the experience and authority of the *Thomas* court in analyzing governmental setoff claims,[14] and this court agrees that the federal regulations technically do not apply to a setoff under section 553. Yet, this court finds it awkward at best to conclude that a right of setoff exists among federal units while ignoring the very statutory and regulatory basis and framework for that right. This court also agrees that section 507(a)(7) does not apply per se to setoff under section 553. However, the legislative intent evident from the statutory provisions and from the history of section 507 in particular compels the undersigned to disagree respectfully with the final outcome in the *Thomas* decision.

Certainly the order of distribution in a Chapter 7 case is clear. 11 U.S.C. section 726(a)(1) provides that property of the estate shall be distributed first to the claims and in the order specified in 11 U.S.C. section 507. Only after those claims are satisfied do unsecured claims receive a divi-

---

12. Had the FmHA filed a proof of claim showing a deficiency upon liquidation of the real estate securing its claim but no request for setoff against the ASCS–CCC payments and had the court allowed the SBA to set off those payments, the SBA's recovery might also have been at the expense of the FmHA as a general unsecured creditor entitled to a distribution from the estate (if funds existed) pursuant to 11 U.S.C. section 726.

13. According to the legislative history of section 554, "[a]bandonment may be to any party with a possessory interest in the property abandoned". House Report No. 95–595, 95th Cong., 1st Sess. 377 (1977); Senate Report No. 95–989, 95th Cong., 2d Sess. 92 (1978), U.S. Cong. & Admin.

News 1978, p. 5787. For the limited purpose of the textual discussion, the court will assume that the SBA would have a possessory interest.

14. Bankruptcy Judge Akard also authored *In re Stephenson,* 84 B.R. 74 (Bankr.N.D.Tex.1988) (FmHA not entitled to set off CCC disaster payments which were Congressionally approved postpetition in Chapter 12 case; *In re Buske,* 75 B.R. 213 (Bankr.N.D.Texas 1987) (FmHA entitled to set off CCC deficiency payments in Chapter 7 case after compensating debtor for expenses and labor in producing crop upon which deficiency payments were based); and *In re Pinkert,* 75 B.R. 218 (Bankr. N.D. Texas 1987) (FmHA allowed to set off CCC deficiency and disaster payments in Chapter 11 case).

dend. With respect to governmental units, section 507 provides priority status only for certain tax claims. It does not contemplate priority status for any other debts owing the United States as did its predecessor, section 64a(5) of the Act. To allow a federal agency to offset an amount owed by another federal agency against its claim under either the priorities set forth in the regulations or as fashioned by a court attempting to apply a common law equity standard would seemingly ignore and undermine the order of distribution specified by Congress.

For example, if the SBA were granted relief from the stay to pursue an administrative offset in this case, the order of priorities mandated by 7 C.F.R. 13.7 would be similar to the Code only with respect to taxes. Even that limited similarity with sections 507 and 726 would disappear if the FmHA were seeking an offset because 7 C.F.R. 13.7 puts that agency ahead of the Internal Revenue Service (IRS) for distribution purposes. Likewise the *Thomas* type remedy is at odds with the Code.

Under this court's analysis, the CCC in *Thomas* would have been entitled to set off the disaster payments against its claim—assuring compliance with section 553 and not inconsistent with section 106(b).[15] If funds remained after the CCC claim was satisfied, the trustee would have distributed them in accordance with sections 507 and 726. With respect to the governmental units, the IRS would have been satisfied first and, if possible, in full—assuring the debtor as much of a fresh start as possible under the circumstances. That is, pursuant to 11 U.S.C. section 523(a)(1), certain taxes are *not* included in an individual debtor's discharge. Next, any remainder would have been distributed pro rata to the general unsecured claim holders including the SBA and the FmHA—assuring that similarly situated creditors were treated in a nondiscriminatory fashion consistent with Congressional intent.

Overall the societal cost of rehabilitating or alleviating the load of the debt ridden segment of the populace is distributed fairly and evenly among unsecured creditors under the Code. To the extent governmental and nongovernmental creditors timely file their proofs of unsecured claims and recover somewhat from the estates on a nationwide basis, both taxpayers and consumers should benefit indirectly.

## CONCLUSION AND ORDER

WHEREFORE, based on the foregoing analysis, the court finds that the SBA may not set off the debt of the ASCS–CCC against its claim because no mutual capacity exists between the SBA and the ASCS–CCC.

THEREFORE, the SBA's motion for relief from the automatic stay is denied.

Signed and filed this 5th day of July, 1988.

---

15. Like the debtors in this case, the debtor in *Thomas* entered into the ASCS–CCC contract prior to filing for bankruptcy but the actual amount owed under the 1986 contract was not determined until after the case was commenced. For the purpose of the textual discussion, the court assumes a finding of mutuality between the debtor and the ASCS–CCC. The court neither adopts nor rejects the analyses set forth in those cases that find that the contractual requirements under the ASCS–CCC programs are in the nature of duties and promises rather than conditions precedent and, in turn, hold that the ASCS–CCC obligations arise at the time the prepetition contracts are entered. *In re Greseth*, 78 B.R. 936 (D.Minn.1987); *Matter of Matthieson*, 63 B.R. 56 (D.Minn.1987); *Waldron v. Farmers Home Admin.*, 75 B.R. 25 (N.D.Tex.1987). *Contra In re Walat Farms, Inc.*, 69 B.R. 529 (Bankr. E.D.Mich.1987) and *In re Hill*, 19 B.R. 375 (Bankr.N.D.Texas 1982).

Since the court has disposed of the SBA's claim of setoff against the ASCS–CCC payments on the basis of "lack of mutual capacity", the other issues raised by the debtors and the trustee are not ripe for consideration. With respect to the challenge that the ASCS–CCC benefits are postpetition, the court only observes that the cited cases holding the benefits are prepetition do so without discussing any distinction between the debtor and the debtor in possession or the trustee. Likewise, with regard to the trustee's contention that the contract in issue is executory, the court notes that those same cases do not actually find that the contracts in question are not executory. As Judge Akard implies in *In re Buske*, 75 B.R. 213, 216 (Bankr.N.D.Tex.1987) and *In re Pinkert*, 75 B.R. 218, 221 (Bankr.N.D. Tex.1987), the executory contract argument is simply foreclosed by the "mutual obligation" analysis.

## APPENDIX A

§ 1951.101 General.

The Federal Claims Collection Act of 1966 as amended by the Debt Collection Act of 1982 and the Deficit Reduction Act of 1984 authorize Farmers Home Administration (FmHA) to use administrative, salary and Internal Revenue Service (IRS) offsets to collect delinquent debts. Any money that is or may become payable from the United States to an FmHA borrower may be subject to offset for the collection of a delinquent debt the borrower owes to FmHA. In addition, money may be collected from an FmHA's borrower's pay for delinquent amounts owed by that borrower to FmHA if the borrower is an employee of a Federal agency, the U.S. Postal Service, the Postal Rate Commission, or a member of the U.S. Armed Forces or the Reserve.

§§ 1951.102—1951.104 [Reserved]

§ 1951.105 Administrative offset.

When a Farmer Program borrower is owed money by another Federal agency (except a tax refund owed by IRS), this section explains how to collect delinquent amounts owed by that borrower to FmHA. Payment up to the delinquent amount will be made to FmHA directly by the other Federal agency. The delinquent amount does not have to be reduced to judgment or be undisputed and the payment does not have to be covered by an FmHA security instrument. Before another Federal agency can be asked to offset any amount, the borrower's account must be accelerated. Offset cannot be used, if, according to State law, accepting a payment after acceleration has the effect of reinstating the account. A State supplement must be issued explaining whether offset can be used in each State. Section 1955.15(d)(3) of Subpart A of Part 1955 of this chapter is not applicable to this situation. Decisions made under the following sections are not appealable under Subpart B of Part 1900 of this chapter.

(a) *Feasibility of administrative offset.* The first step a County Supervisor must take to use this offset procedure is to decide if offset is feasible. If the County Supervisor decides that offset is not feasible, the reasons for this decision will be documented in the running case record and no offset will be made. If offset is feasible, the directions in the following sections will be used to collect by offset. Offset is *not* feasible if:

(1) It is not practical. For example, the cost to the Government of collecting by offset might exceed the amount of the delinquency.

(2) Making the payment directly to FmHA would substantially interfere with or defeat the purpose of the other Federal agency.

(3) The account has not been accelerated.

(4) There are legal obstacles to collecting the debt. For example, if the borrower is under the jurisdiction of a bankruptcy court or if the statute of limitations on collecting the debt has expired, the debt cannot be collected by offset. The State Office should contact the Office of General Counsel (OGC) for advice, if necessary.

(b) *Notice to borrower of administrative offset.* After the County Supervisor has determined it is feasible to collect by offset, the County Supervisor will send the borrower FmHA Form Letter 1951–1 or FmHA Form Letter 1951–2. This will be personally delivered to the borrower or sent by certified mail, return receipt requested, with a copy sent by regular mail on the same day. If the certified mail receipt is returned, it will show when the borrower received the FmHA Form Letter and the time limits set out in FmHA Form Letters 1951–1 or 1951–2 will run from that date. If delivery by certified mail is not accomplished, FmHA will assume that the borrower received the FmHA Form Letter by regular mail on the day the certified mail was refused or was unable to be delivered. If the borrower does not take any action within the time limits set out in FmHA Form Letter 1951–1, the County Supervisor will prepare and send FmHA Form Letter 1951–3 as required by § 1951.105(d) of this subpart. FmHA Form Letter 1951–2 may be used if the County Supervisor has reason to believe that another Government agency is about

to make a payment to a borrower *and* if failure to make an offset would substantially prejudice the government's ability to collect *and* if there is not enough time to use FmHA Form Letter 1951-1 and complete the procedures set out in § 1951.105 of this subpart. FmHA Form Letter 1951-2 may also be used if the borrower had an FmHA appeal hearing to contest the delinquency and the existence of the debt. FmHA Form Letter 1951-2 may not be used in any other circumstances. If FmHA Form Letter 1951-2 is used, FmHA Form Letter 1951-3 will be prepared and sent as set out in this subpart.

(c) *Borrower's request for records, offer to repay or request for a review regarding administrative offset.* (1) If a borrower responds to FmHA Form Letters 1951-1 or 1951-2 by asking to review and copy FmHA's records relating to the delinquent debt, the County Supervisor must promptly respond by sending a letter which tells the borrower the location of the borrower's FmHA files and that the files may be reviewed and copied within the next 30 calendar days. Copying costs (see FmHA Instruction 2018-F) and the hours the files will be available each day will be set out in the letter.

(2) If a borrower responds to FmHA Form Letter 1951-1 by offering to repay the delinquency, the offer will be accepted only if the County Supervisor decides that an offset would result in undue financial hardship to the borrower or would be unfair to the borrower for some reason. This decision will be documented in the running case record and the borrower will be sent a letter which sets out the County Supervisor's decision to accept or reject the offer to repay. Form FmHA 440-9, "Supplementary Payment Agreement," will be used if a repayment offer is accepted. The County Supervisor must decide whether to accept the offer within 45 calendar days after the initial offer to repay is made.

(3) If a borrower responds to FmHA Form Letters 1951-1 or 1951-2 by asking for a review of FmHA's determination that a debt exists and/or is delinquent, the borrower then has 10 calendar days to send the County Supervisor evidence supporting the borrower's position. As soon as possible, the County Supervisor will forward the borrower's request for a review, the borrower's case file and all evidence provided by the borrower to the District Director for review. If the borrower asked for a hearing, the District Director will decide if one is needed. A hearing is needed only if the question of the delinquency and the existence of the debt cannot be determined from a documentary review of the borrower's file and any other evidence provided. If a hearing is needed, the borrower will be informed in writing of the time and place of the hearing; Exhibit A to Subpart B of Part 1900 of this chapter will be sent to the borrower and those directions will be followed. If the borrower requests a hearing and the District Director determines that a hearing is not needed, the District Director will inform the borrower in writing of why a hearing is not needed within 15 calendar days of receiving the borrower's file and evidence. The District Director will then conduct a documentary review within 45 days of when the borrower asked for a review. At the hearing or after the documentary review, the District Director will decide whether the debt exists and/or is delinquent; this decision will be made within 30 calendar days of the hearing or review. The District Director will send the borrower a letter which explains the decision. The District Director's decision is final and the borrower has no right to a further review. Copies will be sent to the borrower's attorney (if any), the County Supervisor, and the Assistant Secretary for Administration, USDA, Washington, DC 20250.

(4) The time limits set in FmHA Form Letters 1951-1 or 1951-2 run concurrently. If a borrower asks to review the FmHA file and offers to repay the debt, the borrower cannot take 30 calendar days to ask to review the FmHA file and then take an additional 30 days to offer to repay. The request to review the file, the offer to repay and/or request for a review must all be made within 30 days of the date the borrower receives the FmHA Form Letter. FmHA then has a maximum of 45 calendar

days from the day the borrower's request is received by FmHA to evaluate the offer to repay or complete the review.

(d) *Request for administrative offset.* If FmHA Form Letter 1951–2 has been sent, FmHA Form Letter 1951–3 will be prepared and mailed immediately by the County Supervisor. If FmHA Form Letter 1951–1 has been sent, FmHA Form Letter 1951–3 will be prepared by the County Supervisor after: (1) The borrower has reviewed the file (or the time for review has expired, whichever comes first); (2) a review of the record and any evidence provided by the borrower or a hearing has been concluded and a decision has been made that the debt exists and is delinquent; or (3) a decision is made whether to accept a repayment offer. FmHA Form Letter 1951–3 will be sent by the County Supervisor to the Agricultural Stabilization and Conservation Service (ASCS), Federal Crop Insurance Corporation (FCIC) or any other Federal agency likely to have money scheduled to be paid to the borrower. Exhibit A of this subpart (available in any FmHA office) provides the addresses of officials to whom a completed FmHA Form Letter 1951–3 should be mailed. The County Supervisor will send a copy of the completed FmHA Form Letter 1951–3 to the State Administrative Officer.

(e) *Application of payments, refunds and overpayments for administrative offset.* (1) Only delinquencies can be collected by offset. Therefore, if an FmHA Form Letter 1951–3 is submitted to another Federal agency which owes a borrower an amount in excess of the FmHA delinquency, that excess will be remitted to the borrower by the other agency.

(2) If a borrower is delinquent on more than one FmHA debt, amounts collected by offset will be distributed and applied as regular payments.

(3) If a borrower receives FmHA Form Letter 1951–2 of this subpart and an offset is made and after a review of the FmHA file and any evidence presented by the borrower the County Supervisor/District Director decides that the offset should not have been made or should have been made

for a lesser amount, a refund will be processed promptly in accordance with § 1951.13(b) of Subpart A of Part 1951 of this chapter. The borrower is not entitled to interest on the amount refunded.

(4) If FmHA receives money through an offset but the borrower is not delinquent at the time or the amount received is in excess of the delinquency, the entire amount or the amount in excess of the delinquency must be refunded promptly to the borrower in accordance with § 1951.13(b) of Subpart A of Part 1951 of this chapter. The borrower is not entitled to any payment of interest on the refunded amount.

(5) All amounts collected by offset will be recorded on Exhibit B of this subpart (available in any FmHA office) by the County Supervisor. Exhibit B will be filed in operational file 1951–Offsets, and a copy will be sent to the State Administrative Officer every six months.

(f) *Cancellation of administrative offset.* If a borrower's name has been submitted to another agency for offset and the borrower's account is brought current (either by payment or by some servicing action), the County Supervisor will notify the other agency that the borrower is no longer delinquent. The addresses listed on Exhibit A of this subpart (available in any FmHA office) will be used.

(g) *Administrative offset of FmHA money.* FmHA will not offset its loan or grant funds at the request of other agencies. Information provided by other agencies about debts owed to them will be considered by FmHA when it evaluates a borrower's repayment ability and will be compared to financial information that the borrower provided.

[51 FR 42821, Nov. 26, 1986, as amended at 52 FR 18544, May 18, 1987]